Randy K. Dix
Randy Dix Law Office
320 11th Avenue
Helena, MT 59601
(406) 996-1171
randy@randydixlaw.com

Daniel P. Buckley
Buckley Law Office, P.C.
125 West Mendenhall, Suite 201
Bozeman, Montana 59715
406-587-3346
dbuckley@danbuckleylaw.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| The ESTATE OF GARY WAXBOM, by and through his Personal Representative Elizabeth Waxbom and ELIZABETH WAXBOM, individually,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Cause No. _____<br><br>**COMPLAINT** |

COME NOW the Plaintiffs, by their counsel of record, for their claims for

*Estate of Gary Waxbom, et al., v. United States of America*

relief, do herby allege as follows:

## PARTIES

1.   At all times relevant hereto, Gary Waxbom, now deceased, was a citizen of Lincoln County, Montana, and resided before his death in Libby, Montana.

2.   An Estate for Mr. Waxbom has been established and filed in the Nineteenth Judicial District, Lincoln County, Montana, cause number, DP-15-122.  Mrs. Waxbom has been appointed the personal representative for the Estate of Gary Waxbom.

3.   At all times relevant hereto, Plaintiff Elizabeth Waxbom was a citizen of Lincoln County, Montana, and resided in Libby, Montana.  Elizabeth Waxbom was married to Mr. Waxbom.

4.   The claims against Defendant United States of America arise from the health care services provided by Northwest Community Health Center to Gary Waxbom.  Northwest Community Health Center is located in Libby, Montana, and is a federally supported health center.

5.   The negligent acts and omissions that are the subject of this action were committed by Defendant Northwest Community Health Center's agents and employees while acting within the course and scope of their employment.

## JURISDICTION AND VENUE

6.   Northwest Community Health Center is a federally supported health center.

*Estate of Gary Waxbom, et al., v. United States of America*

Pursuant to the Federally Supported Health Center Assistance Act, exclusive jurisdiction lies with the federal district court pursuant to the Federal Tort Claims Act.  *See* 42 U.S.C. § 233(g)-(n); and, 28 U.S.C. §§ 2671-80.

7.  The jurisdiction of this Court is invoked pursuant to said statutes and 28 USC § 1346(b), *et seq.*, more commonly known as the Federal Tort Claims Act, in that agents and employees of Northwest Community Health Center, acting within the scope of their employment, committed negligent acts as hereinafter more specifically alleged.  This Court has exclusive jurisdiction over tort claims brought against the United States pursuant to 28 USC §§ 1346(b), 2671, *et seq*.

8.  Plaintiffs filed an administrative tort claim on May 4, 2015, for relief with the appropriate Federal agency, the US Department of Health & Human Services, in a timely manner under the Federal Tort Claims Act, 28 USC § 2675(a).  On May 18, 2015, Plaintiffs' counsel received correspondence from the US DHHS confirming receipt of the claim.  The US DHHS did not substantively respond or otherwise make a final disposition to the administrative tort claim within 6 months.  Pursuant to 28 USC § 2675(a), the lack of further response is considered a denial of the claim; and, as such, this tort claim is timely brought pursuant to 28 USC §§ 2675 and 2401(b), and case law interpreting the same.

*Estate of Gary Waxbom, et al., v. United States of America*

9.   All of the events, errors, omissions and occurrences, which give rise to this

lawsuit, took place and were committed in Lincoln County, Montana.

Therefore, venue of this action is appropriate in the Missoula Division

pursuant to Local Rules 1.2(c)(5) and 3.2.

## NATURE OF THE CASE

10.   Gary Waxbom was 64 years old when this claim was brought.  Mr. Waxbom

died shortly thereafter on June 1, 2015.  His Estate and his surviving wife

bring this claim arising from the belated diagnosis and treatment of non-

small cell lung cancer (adenocarcinoma) of Mr. Waxbom.

11.   Mr. Waxbom sought primary care from Northwest Community Health

Center, and was attended and cared for by its employees and/or agents, Dr.

Charles LaGoy and Physician's Assistant Scott Lacefield during all times

relevant hereto.  Dr. LaGoy was the primary care giver for Mr. Waxbom.

Based on the records, PA Lacefield first took over Mr. Waxbom's care in or

about October 2013.

12.   The provider(s) failed to appreciate that Mr. Waxbom, who had a long

history of smoking along with significant, unexplained weight loss over a

short period of time, and pain, had significant indicators for possible

malignancy.  Each of these indicators, individually and together, should have

alerted the providers to a high index of suspicion for malignancy, prompting

*Estate of Gary Waxbom, et al., v. United States of America*

them to order imaging studies for screening and/or detecting malignancy.

13.     This claim arises from the failure to refer Mr. Waxbom for lung cancer screening.  As discussed below, lung screening guidelines in 2013, in addition to dramatic weight loss in 2013, should have prompted the provider(s) to discuss and counsel Mr. Waxbom regarding screening benefits (versus risks), and refer Mr. Waxbom for lung cancer screening (i.e., chest radiographs and/or low-dose chest CT).

14.     The earliest that Mr. Waxbom became aware that he had cancer was approximately March 12, 2014.  This is the first time Mr. Waxbom became aware or should have been become aware that he potentially had cancer.

15.     By the time of Mr. Waxbom's diagnosis (initial finding of an invasive mass was on March 12, 2014), the cancer was stage IV and had metastasized. Though treatment was initiated, Mr. Waxbom's cancer progressed, moving into his brain.

16.     On June 1, 2015 Mr. Waxbom died from the cancer.

17.     Mr. Waxbom lost the chance to treat his cancer earlier and to treat his cancer more successfully.

18.     The negligence of the medical providers at Northwest Community Health was a cause in bringing about these damages/injury/death and/or was a substantial factor in bringing about the damages/injury/death, and these

*Estate of Gary Waxbom, et al., v. United States of America*

damages/injuries/death would not have occurred without said negligence.

### CLAIMS FOR RELIEF
### AND ALLEGATIONS OF NEGLIGENCE
### (WRONGFUL DEATH AND SURVIVORSHIP)

19.   Mr. Waxbom sought frequent primary care from Northwest Community Health Center, including care for chronic and intractable thoracic back pain, secondary to a workplace accident in 2001.

20.   Mr. Waxbom presented to Northwest Community Health Care on a regular basis, and was under the care of Dr. Charles LaGoy.  The chart regularly notes that Mr. Waxbom was historically a heavy smoker, and the chart also reflects a significant amount of unintentional weight loss over a relatively short period of time.

21.   PA Lacefield took over the direct care of Mr. Waxbom in October 2013. Previously, Mr. Waxbom had been able to discontinue his longtime narcotics pain control for his back injury.  However, beginning in December 2013, Mr. Waxbom was reporting significant change to the quality and intensity of his pain.  On December 9, 2013, Mr. Waxbom presented to PA Lacefield with complaints of back pain (primarily right-sided), dyspepsia (chest discomfort secondary to gas) and shortness of breath when lying on his side.

22.   On December 16, 2013, Mr. Waxbom presented to PA Lacefield with

*Estate of Gary Waxbom, et al., v. United States of America*

complaints of worsening right-sided lumbar pain and muscle pain in that area (10/10 on the pain scale).

23.   On December 19, 2013, Mrs. Waxbom called and reported that Mr. Waxbom was having "breathing problems with tramadol". On December 20, 2013, Mrs. Waxbom called and reported that Mr. Waxbom was having difficulties sleeping, and suffering from anxiety symptoms. Mr. Waxbom made the same report on December 26, 2013.

24.   On January 28, 2014, Mr. Waxbom presented to PA Lacefield for follow-up. PA Lacefield was the first to document concerns over weight loss during this visit. That note indicates, "Patient has documented **unintentional weight loss** of greater than 35 pounds in the past 6 months. Patient does have tobacco use history...." (Emphasis added). Mr. Waxbom's weight was 219 pounds on that date (down from 285 pounds approximately 1 year earlier). The note further indicates that, although Mr. Waxbom has changed his diet (decreasing sugars), he is, "...still eating adequate number of calories...." Under Mr. Lacefield's assessment, it is noted, "**Unintentional weight loss**...Rapid weight loss in patient with significant smoking history, **so obvious concern for malignancy**...." (Emphasis in note). Laboratory work and colonoscopy was ordered. The colonoscopy was normal in all relative aspects. No imaging or chest radiographs were ordered.

*Estate of Gary Waxbom, et al., v. United States of America*

25.  On February 20, 2014, Mr. Waxbom presented to PA Lacefield for back pain once again.  No discussions appear in the record regarding malignancy concerns.

26.  By March 7, 2014, Mr. Waxbom's back pain was becoming intolerable and was radiating down his right leg.  Mr. Waxbom reported to the Emergency Room, and an MRI was ordered.

27.  On March 10, 2014, Mr. Waxbom reported to PA Lacefield, for follow up to his ER visit.  An MRI was ordered for "low back pain".  No discussions appear in the record regarding malignancy concerns.

28.  A MRI was completed on March 12, 2014.  The radiologist reported a "destructive mass involving the right ilium", already extending into the adjacent soft tissues, i.e., the right iliopsoas muscle.  The radiologist was suspicious of this mass for metastatic malignancy or plasmacytoma.  The radiologist was less suspicious that the findings were representative of a primary bone tumor.

29.  On March 12, 2014, Mr. Waxbom presented to PA Lacefield, wherein the MRI findings were discussed, and PA Lacefield noted a concern for lung cancer as the potential primary.  CT scans of the chest, abdomen and pelvis were ordered.

30.  CT scans were completed on March 14, 2014.  The significant findings

*Estate of Gary Waxbom, et al., v. United States of America*

consisted of: (1) a large mass along the right hilum, extending into the right upper lobe, "most likely is an underlying primary malignancy", (2) two smaller lesions (one in the left lung and one in the right upper chest), possibility metastatic, (3) mediastinal adenopathy involvement, and (4) confirmation of the large destructive lesion in the right ileum, extending into the soft tissues.  The radiologist reported that the large lesions in the right hilum and the right ileum are "aggressive in appearance".

31.   A biopsy of the right ilium lesion demonstrated adenocarcinoma consistent with the lung lesion as the primary.  The lung cancer was stage IV (i.e., non-small cell lung cancer metastasized to the hip).

32.   As indicated in the Northwest records, Mr. Waxbom was a historically "heavy" smoker, reportedly 11-20 cigarettes/day per the medical records. Before his death, Mr. Waxbom's perpetuation testimony was taken.  Mr. Waxbom testified that he started smoking at age 12, and averaged 1 - 1 ½ packs per day until his 60s (wherein he has attempted to curb the use of cigarettes).  This historical use of cigarettes roughly equates to 50 pack-years on the low end (i.e., approximately 50 years of smoking multiplied by 1 pack per day).

33.   Prior to these events, in January 2013, the American Cancer Society published guidelines that recommend physicians discuss lung cancer

*Estate of Gary Waxbom, et al., v. United States of America*

screening with their patients who meet the following criteria: (1) patients aged 55 to 74, (2) who have a smoking history equivalent to a 30-year pack history, and (3) who currently smoke or have quit within the past 15 years. If these criteria are met, the patient should be recommended to pursue screening after discussion with and consent of the patient.

34.   Further, the U.S. Preventive Task Force issued these same recommendations in a draft statement in July 2013 (except modifying the age range to 55-79 years old).  Further, these recommendations were discussed in the American Academy of Family Physicians (AAFP) in July 2013.

35.   Mr. Waxbom was, at the relevant times herein, between the age of 55-74, had more than a 30 pack-year history, and had not quit smoking in the prior 15 years.  However, during his care and treatment at Northwest, Mr. Waxbom was not counseled or advised as to lung cancer screening, and was not referred for lung cancer screening, despite these guidelines for screening patients who are between the ages of 55-74 with a 30 pack-year history or more and who have not quit within the prior 15 years.

36.   Furthermore, during his care at Northwest, Mr. Waxbom's weight was taken and recorded regularly.  The following chart reflects and demonstrates that Mr. Waxbom presented with a dramatic weight loss over a relatively short period of time in 2013:

*Estate of Gary Waxbom, et al., v. United States of America*



| Date | Weight (lbs.) per Northwest's records |
|---|---:|
| 3/21/12 | 291.0 |
| 10/5/12 | 288 |
| 11/2/12 | 283 |
| 11/28/12 | 285 |
| 3/4/13 | 280.4 |
| 4/5/13 | 268 |
| /10/13 | 264.6 |
| 7/12/13 | 254.2 |
| 10/29/13 | 240 |
| 12/9/13 | 231 |
| 12/16/13 | 228 |
| 12/30/13 | 228 |

*Estate of Gary Waxbom, et al., v. United States of America*

| | |
|---|---|
| 1/28/14 | 219 |
| 2/20/14 | 218.8 |
| 3/10/14 | 224 |
| 3/19/14 | 221.4 |

37.  The American Cancer Society states that unexplained weight loss of 10 pounds or more may be the first sign of cancer, which happens most often with certain cancers, including lung cancer.  According to American Academy of Family Physicians, unintentional weight loss includes more than a 5% reduction in body weight within 6-12 months, and that malignancy is attributable to 19-36% of patients with such weight loss.  Per the AAFP, one of the leading causes of unintentional weight loss is lung cancer.

38.  Mr. Waxbom, at the relevant times herein, unintentionally lost significant weight in a short period of time.

39.  The provider(s) did not discuss or counsel Mr. Waxbom as to his significant weight loss over a short period of time as a possible indicator of malignancy, nor does it appear that the provider(s) considered that said weight loss should have prompted them to hold a high index of suspicion of malignancy (especially when coupled with Mr. Waxbom's long history of heavy smoking).

*Estate of Gary Waxbom, et al., v. United States of America*

40. The providers also failed to appreciate that Mr. Waxbom's pain had increased and changed in December 2013. This dramatic increase in pain should have alerted the providers that urgent work-up of this symptom was necessary, which would have led to earlier imaging and identification of his cancer/lesions.

41. Following the initial CT scans in March 2014, additional imaging to stage the cancer (look for additional masses) was undertaken. Initially, there was no evidence of intracranial metastasis. Imaging of the masses in the pelvis and chest was done regularly. There was initially some reduction of the large hilum mass in the right lung. On June 19, 2014, a 3 mm lesion was identified in the frontal lobe. The lesion did slightly decrease with the therapy (radiation), as documented on July 24, 2014. Imaging from October 21, 2014, showed that the lung masses had increased in size and number.

42. Mr. Waxbom began care with Dr. Ryan Roop, oncologist, in March 2014, who initiated chemotherapy and radiation treatments. Although the treatments seemed to initially halt the disease, the cancer did continue to progress and further metastasize. By September 2014, Dr. Roop determined that there had been definite interval progression of the cancer and recommended cessation of the chemotherapy. Focus was turned to maintenance therapy, balanced with quality of life. The terminal nature of

the disease was discussed with Mr. Waxbom in October 2014.

43.    Mr. Waxbom died on June 1, 2015.

44.    The provider(s) herein deviated from the standard of care by, without limitation:

a.    Failing to appreciate that Mr. Waxbom was an appropriate patient to counsel and refer for lung cancer screening, given his history of smoking and his age, and the guidelines discussed above;

b.    Failing to appreciate and hold a high index of suspicion that Mr. Waxbom's significant and unintentional weight loss in a short period of time was a significant indicator of possible malignancy, especially given his history of heavy smoking and his age, and failing to refer Mr. Waxbom for chest radiographs and/or other imaging;

c.    Failing to appreciate that Mr. Waxbom's changed pain quality and intensity was an indicator of a change in his health, and failing to work-up this change, such as with imaging; and,

d.    To preserve the issues, by failing to properly monitor and oversee the care of Mr. Waxbom, in particular, by Dr. LaGoy failing to properly oversee the care of Mr. Waxbom by PA Lacefield, as it related to the matters set forth herein.

*Estate of Gary Waxbom, et al., v. United States of America*

45.  As with most types of cancer, delay in diagnosis and appropriate treatment can and does frequently permit distant metastasis, advancement of the disease process and prognostic alteration for the worse.

46.  Had the provider(s) not departed from accepted standards of care that govern their respective specialty training and experience, Mr. Waxbom would have avoided the consequence of stage IV lung cancer; and/or, had the provider(s) not departed from the accepted standards of care that govern their respective specialty training and experience, the underlying condition of Mr. Waxbom would not have been aggravated to a significant but un-apportionable degree.

47.  The substandard care rendered in this case either caused or substantially contributed to Mr. Waxbom's disease.

48.  Pertinent to the causation doctrines articulated in both relevant Montana case law and statute, Mr. Waxbom also relies upon the doctrines of loss of chance.

49.  Plaintiffs have suffered significant special and general damages.

50.  Plaintiffs suffered damages as a result and cause of the negligence complained of herein.  The acts, omissions, and errors complained of herein were a cause and/or a substantial factor (a legal causation issue for the Court to determine) to the damages, injuries, and death.

*Estate of Gary Waxbom, et al., v. United States of America*

WHEREFORE, Plaintiffs pray as follows:

1. For all actual and compensatory damages, including special and general damages;

2. For costs and expenses of suit as are allowed by applicable law;

3. For prejudgment interest on all items so calculable under applicable law;

4. For such further and additional relief which this Court deems just and proper.

RESPECTFULLY SUBMITTED and DATED this 23rd day of December, 2015.

BUCKLEY LAW OFFICE, P.C.


By:_/s/_Daniel P. Buckley_____
Daniel P. Buckley
Attorneys for Plaintiffs

*Estate of Gary Waxbom, et al., v. United States of America*

16